UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Dennis Allen Jenkerson

        v.                                Civil No. 10-cv-209-JD

Michael J. Astrue, Commissioner,
Social Security Administration


## REPORT AND RECOMMENDATION

        Pursuant to 42 U.S.C. § 405(g), Dennis Jenkerson moves to
reverse the Commissioner's decision denying his application for
Social Security disability insurance benefits under Title II of
the Social Security Act.  The Commissioner, in turn, moves for
an order affirming his decision.  I recommend that the decision
this matter be remanded to the Administrative Law Judge ("ALJ")
for further proceedings consistent with this report and
recommendation.


## Standard of Review

        The applicable standard of review in this case provides, in
pertinent part:

        The [district] court shall have power to enter, upon
        the pleadings and transcript of the record, a judgment
        affirming, modifying, or reversing the decision of the
        Commissioner of Social Security, with or without
        remanding the cause for a rehearing.  The findings of

the Commissioner of Social Security as to any fact, if
supported by substantial evidence, shall be conclusive
. . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of

social security disability benefits unless 'the [Commissioner]

has committed a legal or factual error in evaluating a

particular claim.' " Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15,

16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877,

885 (1989)).

As for the statutory requirement that the Commissioner's

findings of fact be supported by substantial evidence, "[t]he

substantial evidence test applies not only to findings of basic

evidentiary facts, but also to inferences and conclusions drawn

from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916,

917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727,

730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more

than [a] mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a

conclusion.'" Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st

Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401

(1971)).  But, "[i]t is the responsibility of the [Commissioner]

to determine issues of credibility and to draw inferences from

the record evidence.  Indeed, the resolution of conflicts in the

evidence is for the [Commissioner], not the courts." Irlanda

Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991)

(citations omitted).  Moreover, the court "must uphold the
[Commissioner's] conclusion, even if the record arguably could
justify a different conclusion, so long as it is supported by
substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529,
535 (1st Cir. 1988).  Finally, when determining whether a
decision of the Commissioner is supported by substantial
evidence, the court must "review[] the evidence in the record as
a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v.
Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material
Facts, doc. no. 12.  That statement is part of the court's
record and will be summarized here, rather than repeated in
full.

Until August 15, 2007, his alleged onset date, Dennis
Jenkerson worked in the construction industry, as the owner of a
construction company and as a floater.  He did framing,
installed drywall, and performed electrical work, plumbing, and
repairs.  He stopped working due to back pain he alleges was so
severe it prevented him from wearing his tool belt.  From the
date on which he left work until September 8, 2008, when he was
approved for the State of New Hampshire's Aid to the Permanently
and Totally Disabled ("APTD") program, Jenkerson was without

3

health insurance.[1]  He filed his application for Social Security
disability insurance benefits on June 19, 2008.

At his hearing before the ALJ, Jenkerson testified that he
has suffered from low back pain since 1995, and that since then,
the pain has progressed to his hips and legs.  From May of 2003
through June 16, 2008, he was treated by a chiropractor for low
back pain, hip pain, and foot drop.  After he stopped work,
Jenkerson made at least seven visits to Wellington Chiropractic
before he was awarded APTD benefits.  Tr. 164-65.

On January 3, 2008, Jenkerson visited the Pembroke Wellness
Center ("PWC") complaining of blood in his stool.  On intake, he
reported that he was very healthy, had no medical problems, and

_____

[1] Jenkerson testified at his hearing before the ALJ that he
was accepted into the APTD program in June of 2008, Tr. 28, but
the only relevant document in the record, a letter from the New
Hampshire Medicaid Disability Determination Unit, says that
Jenkerson's application was approved on September 8, Tr. 116.
That letter says, in full:

> You have been medically approved for the APTD
> program on September 8, 2008.
>
> You will receive a letter from your District
> Office stating that you have been approved for the Aid
> to the Permanently and Totally Disabled (APTD)
> Program.  The letter will also tell you the effective
> date of the medical benefits.  You should receive this
> letter within the next few days from the District
> Office.  If you do not receive a letter, please
> contact your Family Service Specialist at the District
> Office.

Tr. 116.  The letter says nothing about the criteria for APTD
benefits or the reasons why Jenkerson's application was
approved.

was taking no medication.  See Tr. 174.  On May 19, he visited
PWC complaining of back pain and lower extremity symptoms.  See
id.  Dr. Steven Kaitz provided the following assessment: "? L
anterior tibialis weakness, possibly from a lumbar
radiculopathy, ? L4.  He seems to have some progressive
neurologic symptoms.  Would also consider a more peripheral
entrapment."  Id. at 175.  On June 2, Jenkerson went to PMC
complaining of a tick bite and also brought up his back pain.
Dr. Kaitz give the following assessment relative to Jenkerson's
complaint of back pain: "Progressive neurologic symptom –
suspect this is a lumbar radiculopathy though now having
bilateral symptoms that are progressive."  Id.  In all,
Jenkerson visited PWC at least three times while he was
uninsured.

     In the progress sheet documenting Jenkerson's June 2 visit
to PWC, Dr. Kaitz wrote:

     He works cleaning houses and finds it significantly
     painful to bend and do many of the duties, and he
     requests a note to be out of work.  He is fairly vague
     initially as to who the note is for as he states he
     works for his girlfriend but eventually clarifies the
     purpose of the note is for child support as he feels
     he needs medical justification if he were to cut down
     his work [hours] and thus his ability to pay support.

Tr. 175.  Dr. Kaitz then established the following plan:

     1) Note written that he should cut down his work, try
     half time, and if not tolerating this, call and we
     will take him out completely.  2) Will arrange for MRI
     of the LS spine.  3) He will keep appointment for

nerve conduction studies which is upcoming, and keep
his F/U appointment with me.  4) Doxycycline 200 mg x
1.

Id.  On June 13, a PWC nurse practitioner provided Jenkerson

with a note stating: "Dennis Jenkerson is under medical care and

may not work until further notice."  Tr. 170.  In addition,

Jenkerson did undergo the MRI Dr. Kaitz arranged, but the record

includes no evidence that he kept his appointment for nerve

conduction studies, kept his follow-up appointment with Dr.

Kaitz, or filled a prescription for Doxycycline.

The MRI Dr. Kaitz arranged was conducted on June 8, and

resulted in the following clinical impression:

> 1. Moderate degenerative disk disease at L4-5 with
> narrowing of the left neural foramen due to laterally
> projecting osteophytes.  No evidence of spinal
> stenosis or disk protrusion.
>
> 2. Mild degenerative disk disease at L1-2.
>
> 3. Transitional anatomy.

Tr. 177.  Based on those findings, Dr. Russell Brummett

recommended both an EMG and consideration of "an epidural

injection versus some physical therapy."  Tr. 179.  There is no

evidence that Jenkerson ever received an epidural injection, and

he did not start physical therapy until nearly seventeen months

later, in November of 2009.

Three months after his June 2008 MRI, Jenkerson qualified

for APTD benefits, but the record discloses no further medical

treatment until June of 2009, when Dr. Linda Mead referred
Jenkerson for another MRI of his lumbar spine and a MRI of his
hips.  The MRI of Jenkerson's back, conducted on June 12, 2009,
resulted in the following impression:

> Stable appearing degenerative disk disease at L4-5
> with moderate left neural foraminal narrowing due
> to lateral osteophytes and mild right foraminal
> narrowing.  Mild degenerative disk disease at L1-2
> appears stable.  No acute findings otherwise, with no
> significant changes from prior.  Also noted is a
> narrowed L5-S1 disk, which is likely due to congenital
> transitional anatomy.  This appears stable.

Tr. 191.  The MRI of his hips, conducted the same day, resulted
in this impression: "No hip abnormality identified thought to be
clinically significant.  Small left femoral head unicameral bone
cyst identified."  Tr. 193.

On October 26, 2009, Jenkerson's primary care physician,
Dr. Deborah Meesarapu, referred him to physical therapy.  She
indicated a diagnosis of left lumbar radiculopathy and gave the
physical therapist instructions to evaluate and treat Jenkerson
as appropriate, and to instruct him in a home exercise program.
See Tr. 196.  The record includes only one other document
relating to medical care provided by Dr. Meesarapu, a December
8, 2009, referral to physical therapy.  In that referral, Dr.
Meesarapu listed a diagnosis of LBP[2] with radiculopathy and gave

---

[2] Given the context, the court presumes that "LBP" is an
abbreviation for "lower back pain.

instructions to complete a functional-capacity evaluation.  See Tr. 194.

Jenkerson was discharged from physical therapy after fourteen visits on January 20, 2010, "due to lack of progress and worsening of L lower extremity weakness."  Tr. 259.

Shortly after Jenkerson applied for Social Security disability insurance benefits, on July 22, 2008, Dr. Joseph Cataldo, a state-agency reviewing physician, completed a residual functional capacity ("RFC") assessment.  In it, he found that Jenkerson could: occasionally lift and/or carry fifty pounds, frequently lift and/or carry 25 pounds, stand and/or walk (with normal breaks) for about six hours in an eight-hour workday, sit (with normal breaks) for about six hours in an eight-hour workday, and push and/or pull without limitation. Tr. 183.  With regard to postural limitations, Dr. Cataldo found that Jenkerson could occasionally climb (ramps, stairs, ladders, ropes, and scaffolds), balance, stoop, kneel, crouch, and crawl. Id. at 184.  Dr. Cataldo's RFC assessment identifies no manipulative, visual, or communicative limitations, and only a single environmental limitation, a restriction from even moderate exposure to hazards.  Tr. 185-86.

The record also includes a functional-capacity assessment completed by Jenkerson's physical therapist, Amy Kershaw, on December 16, 2009, in response to Dr. Meesarapu's referral.

8

Kershaw found that in an eight-hour day, Jenkerson was: (1) unable to bend, squat, or climb; (2) occasionally able to kneel, stand, walk, and sit; and (3) frequently able to reach.  Tr. 234.  She found no restrictions on Jenkerson's ability to perform repetitive motions with his right ankle, but found that he could only occasionally perform repetitive motions with his left ankle.  Id.  As for lifting, she found that Jenkerson was then unable to lift any weight safely from twelve inches to waist height, could lift ten pounds from waist to shoulder, could lift and carry twenty pounds for twenty feet, and could push and pull ten to twenty pounds.  Id.  Her summary assessment was that Jenkerson was capable of sedentary work, i.e., lifting ten pounds occasionally and less than five pounds frequently. Id.

Finally, on January 26, 2010, Dr. Meesarapu completed a form titled "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)."  Tr. 292.  That form asks the person completing it to "[i]dentify the particular medical findings (e.g., physical examination findings, x-ray findings, laboratory test results, history, symptoms (including pain), etc.) which support your opinion regarding any limitations."  Id.

In her evaluation, Dr. Meesarapu stated that Jenkerson could lift and carry a maximum of ten pounds on an occasional basis and a maximum of five pounds on a frequent basis.  Tr.

292.  She found that his maximum ability to stand and walk (with normal breaks) and to sit (with normal breaks) was less than two hours in an eight-hour day.  Id.  She also found that: (1) he could sit for twenty minutes before needing to change positions; (2) he could stand for thirty minutes before needing to change positions; (3) he needs to walk around every thirty minutes, and must do so for forty-five minutes; and (4) he needs the opportunity to shift from sitting to standing at will.  Id. at 292-93.  She identified the medical findings supporting those limitations as "LBP with DJD – per MRI [with left] radioculopathy."[3]  Id. at 293.

With regard to postural activities, Dr. Meesarapu reported that Jenkerson could never twist, stoop (bend), crouch, climb stairs, or climb ladders.  Tr. 293.  She listed Kershaw's functional-capacity evaluation from December of 2009 as the medical finding supporting her assessment of Jenkerson's ability to perform postural activities.  Id.

Dr. Meesarapu also opined that Jenkerson's impairment affected reaching, feeling and pushing/pulling, but did not affect handling or fingering.  Tr. 294.  She identified Kershaw's functional-capacity evaluation and Jenkerson's MRI as the medical findings supporting that opinion.  Id.

---

[3] Given the context, the court presumes that "LBP" is an abbreviation for "lower back pain" and that "DJD" is an abbreviation for "degenerative joint disease."

Finally, Dr. Meesarapu imposed two environmental restrictions, complete avoidance of wetness and hazards.  Tr. 294.  That opinion, as well, was supported by Kershaw's functional-capacity evaluation.  Id.

Dr. Meesarapu concluded that Jenkerson's impairments would cause him to be absent from work about twice a month, that he could work four hours a day, five days a week, and that she was unable to determine whether his impairments could be expected to last for at least twelve months.  Tr. 294-95.

After conducting a hearing, the ALJ issued a decision that includes the following findings:

> 3. The claimant has the following severe impairment: degenerative disc disease of the lumber spine (20 CFR 404.1520(c) and 416.920(c)).
>
> . . . .
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> . . . .
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c).
>
> . . . .
>
> 6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . . .

9. Transferability of job skills is not material to
the determination of disability because applying the
Medical-Vocational Rules directly supports a finding
of "not disabled," whether or not the claimant has
transferrable job skills (See SSR 82-41 and 20 CFR
Part 404, Subpart P, Appendix 2).

Tr. 11, 12, 14.

## Discussion

According to Jenkerson, the ALJ's decision should be
reversed, and the case remanded, because: (1) the ALJ's
credibility determination does not comply with Social Security
Ruling ("SSR") 96-7p; (2) the ALJ failed to mention that he had
been determined disabled and awarded ATPD benefits by the State
of New Hampshire; (3) the ALJ assigned too little weight to the
RFC assessment by his treating physician, Dr. Meesarapu, and too
much weight to the RFC assessment by the non-examining state-
agency physician, Dr. Cataldo; and (4) the ALJ improperly
discounted the RFC assessment by his physical therapist, Amy
Kershaw.  Respondent disagrees, categorically.

To be eligible for disability insurance benefits, a person
must: (1) be insured for such benefits; (2) not have reached
retirement age; (3) have filed an application; and (4) be under
a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question
in this case is whether Jenkerson was under a disability.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

In order to determine whether a claimant is disabled for the purpose of determining eligibility for disability insurance benefits, an ALJ is required to employ a five-step process.  See 20 U.S.C. §§ 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the

13

> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 1520).

The claimant bears the burden of proving that he is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  However,

> [o]nce the [claimant] has met his or her burden at
> Step 4 to show that he or she is unable to do past
> work due to the significant limitation, the
> Commissioner then has the burden at Step 5 of coming
> forward with evidence of specific jobs in the national
> economy that the [claimant] can still perform.  Arocho
> v. Sec'y of Health & Human Servs., 670 F.2d 374, 375
> (1st Cir. 1982).  If the [claimant's] limitations are
> exclusively exertional, then the Commissioner can meet
> her burden through the use of a chart contained in the
> Social Security regulations.  20 C.F.R. § 416.969;
> Medical-Vocational Guidelines, 20 C.F.R. pt. 404,
> subpt. P, App. 2, tables 1-3 (2001), cited in 20
> C.F.R. § 416.969; Heckler v. Campbell, 461 U.S. 458
> (1983).  "The Grid," as it is known, consists of a
> matrix of the [claimant's] exertional capacity, age,
> education, and work experience.  If the facts of the
> [claimant's] situation fit within the Grid's
> categories, the Grid "directs a conclusion as to
> whether the individual is or is not disabled."  20
> C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a), cited in
> 20 C.F.R. § 416.969.  However, if the claimant has

> nonexertional limitations (such as mental, sensory, or
> skin impairments, or environmental restrictions such
> as an inability to tolerate dust, id. § 200(e)) that
> restrict his [or her] ability to perform jobs he [or
> she] would otherwise be capable of performing, then
> the Grid is only a "framework to guide [the]
> decision," 20 C.F.R. § 416.969a(d) (2001).  See also
> Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)
> (discussing use of Grid when applicant has
> nonexertional limitations).

Seavey, 276 F.3d at 5 (parallel citations omitted).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) plaintiff's
> subjective claims of pain and disability as supported
> by the testimony of the plaintiff or other witness;
> and (3) the plaintiff's educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

Before turning to Jenkerson's arguments, the court begins

with a dispositive issue Jenkerson did not raise, the ALJ's

finding that he "has the residual functional capacity to perform

the full range of medium work," Tr. 12, which serves as the basis

for the ALJ's determination that "applying the Medical-Vocational

Rules directly supports a finding of 'not disabled,'"  Id. at 14.

While the ALJ found that Jenkerson had the residual functional

capacity to perform the full range of medium work, that finding

is not supported by any evidence in the record, much less

substantial evidence.  Even the RFC assessment most supportive of

the ALJ's decision, and the one to which he afforded the greatest weight, limited Jenkerson to occasional performance of each of the six postural activities listed on the RFC assessment form. The other two RFC assessments found even more profound postural limitations.  On that basis, it was a factual error for the ALJ to say that Jenkerson can perform the full range of medium work. The relevant regulations explain how the Commissioner should perform disability determinations for claimants who have only nonexertional limitations, see 20 C.F.R. § 404.1569a(c), and for claimants with both exertional and nonexertional limitations, see 20 C.F.R. § 404.1569(a)(d), and given the evidence in this case, it was a legal error for the ALJ to apply the Medical-Vocational Rules directly, see Tr. 14, rather than applying one or the other of the two regulations cited above.

Because there is no evidence in the record to support a determination that Jenkerson is capable of the full range of medium work, the errors described above require remand.  The court recognizes that at the hearing, the ALJ did pose a hypothetical question to the vocational expert ("VE") that accurately tracked the limitations found by Dr. Cataldo, and that the VE opined that there were a variety of jobs that Jenkerson could perform notwithstanding his exertional and nonexertional limitations.  An ALJ's decision based on the VE testimony might well be supportable.  But, given the number of

jobs the VE identified, and the various ways in which a VE's opinion or an ALJ's decision might be challenged, the better course in this case is to remand rather than stepping into the shoes of the ALJ and deciding that Jenkerson is able to perform some or all of the jobs identified by the VE in spite of his nonexertional limitations.  On remand, the ALJ can make a finding regarding Jenkerson's nonexertional limitations, and can then apply the appropriate legal analysis, subject to whatever challenge Jenkerson might care to mount.

Because this case is being remanded, for the reasons given above, it is not necessary to address Jenkerson's four challenges to the ALJ's decision.  See Audler v. Astrue, 501 F.3d 446, 449 (1st Cir. 2007).  Nonetheless, the following observations on those arguments may be useful to the parties on remand.

**Jenkerson's credibility.**  In his decision, the ALJ stated that he did not find Jenkerson's statements about disabling back, leg, and foot pain to be credible.  In support, he noted that: (1) Jenkerson did not seek medical treatment for his back until June of 2008, at which point he had been out of work, purportedly due to his back condition, for nearly ten months; (2) he was under treatment only briefly in 2008, and did not seek treatment again until June of 2009; and (3) he takes no medication.  Jenkerson argues that the ALJ's credibility

determination does not comport with the requirements of SSR 96-
7p because the ALJ failed to consider his chiropractic treatment
from August of 2007 through June of 2008, and also failed to
consider his lack of insurance coverage between his departure
from work and his approval for Medicaid benefits in 2008.

While the ALJ probably should have considered Jenkerson's
chiropractic treatment and his lack of insurance, his failure to
do so does not appear to have led to a credibility determination
that was not supported by substantial evidence.  Had the ALJ
considered Jenkerson's chiropractic treatment, that evidence
easily could have cut both ways, demonstrating that Jenkerson
did seek some treatment, but undercutting his assertion that he
could not afford medical treatment while he was without
insurance coverage.[4]  Moreover, had the ALJ factored in the
matter of insurance coverage, he necessarily would have found
that Jenkerson did have insurance coverage for at least nine
months of the gap between his MRI in June of 2008 and his MRI in
June of 2009.  Finally, the fact that Jenkerson sought no
treatment for a year after getting a note excusing him from work
does seem to support the ALJ's impression that Jenkerson's
doctor visits, infrequent as they were, were not completely
motivated by his impairment and the pain it caused him.  In sum,

---

[4] That assertion is also undercut by Jenkerson's three
visits to PWC, two of them for back pain, before he was approved
for APTD benefits.

there does appear to be substantial evidence in the record to support the ALJ's determination that Jenkerson's credibility is undermined by his minimal record of medical treatment.[5]

**Jenkerson's ATPD benefits.**  The ALJ's decision does not mention the fact that Jenkerson was awarded ATPD benefits by the State of New Hampshire in 2008.  According to Jenkerson, that constitutes reversible error, pursuant to SSR 06-03p, which provides that "evidence of a disability decision by another governmental . . . agency cannot be ignored and must be considered."  2006 WL 2329939, at *6.  As with Jenkerson's chiropractic treatment and his lack of insurance, the ALJ probably should have mentioned the award of ATPD benefits.  But, on the other hand, the record of those benefits in the Administrative Transcript consists of nothing more than a single sentence announcing the award.  There is nothing describing the criteria under which those benefits were awarded, or the evidence that supported Jenkerson's successful application.  In short, the ALJ's failure to mention Jenkerson's APTD benefits does not seem to constitute reversible error.

---

[5] In this context, it is worth pointing out that there are no actual medical records from two of Jenkerson's three primary care physicians; Dr. Mead's only documented involvement in Jenkerson's care consists of ordering two MRIs, and Dr. Meesarapu's only documented involvement in Jenkerson's care consists of referring him to physical therapy and asking his physical therapist to complete a functional-capacity assessment. There are no examination or treatment records from either primary care physician.

**Treating-source opinion.**  The ALJ mentioned Dr. Meesarapu's opinion on Jenkerson's functional capacity but declined to give it controlling weight, explaining that it was not supported by clinical observations and was inconsistent with other substantial evidence, including Dr. Kaitz's observations, Dr. Brummett's clinical assessment, Jenkerson's minimal medical care, and his self-report that he takes no medication. Jenkerson argues that: (1) if the ALJ deemed Dr. Meesarapu's report to be inadequate, he was obligated to contact her to request additional information; (2) the ALJ erroneously determined that Dr. Meesarapu's opinion was inconsistent with medical evidence from Drs. Kaitz and Brummett; (3) the ALJ failed to explain why he credited the opinion of a non-examining physician over the opinion of a treating physician and a treating physical therapist; and (4) Dr. Cataldo's opinion predates much of the relevant evidence in this case, including the June 2009 MRI results, Jenkerson's physical therapy records, and the functional-capacity assessments by Kershaw and Dr. Meesarapu.

Dr. Meesarapu's functional-capacity assessment is, indeed, suspect, for a variety of reasons.  First, the "medical evidence" she cites as supporting her assessment consists of the physical therapist's functional-capacity assessment and the results of one or two MRIs ordered by different physicians,

i.e., Drs. Kaitz and Mead.  The physical therapist's functional-
capacity assessment is not medical evidence, see 20 C.F.R. §§
404.1512(b)(1) and 1528(b)-(c), and the "medical source
statement" Dr. Meesarapu submitted does not appear to be "based
on [her] own medical findings," SSR 96-5p, 1996 WL 374183, at
*4, which significantly diminishes the persuasive value of her
assessment.

        Whether or not the ALJ was required to contact Dr.
Meesarapu for further information about the basis for her
opinion is a close question.  The regulations provide that the
Commissioner "will seek additional evidence or clarification
from [a claimant's] medical source when . . . the report . . .
does not appear to be based on medically acceptable clinical and
laboratory diagnostic techniques," 20 C.F.R. § 404.1512(e)(1),
which would seem to cover Dr. Meesarapu's reliance on Kershaw's
previous functional-capacity assessment.  But, SSR 96-5p
provides that medical sources need to be recontacted only if
"the adjudicator cannot ascertain the basis of the opinion from
the case record," 1996 WL 374183, at *6, which appears not to be
the case here; Dr. Meesarapu indicated exactly what she relied
on.  In any event, this issue could be resolved on remand by
recontacting Dr. Meesarapu, even if the regulations do not
necessarily require that measure.

Another problem with Dr. Meesarapu's opinion arises from the lack of evidence from which the length, nature, and extent of her treatment relationship with Jenkerson can be determined. See 20 C.F.R. §§ 1527(d)(1)(i)-(ii).  The record includes nothing about Dr. Meesarapu's treatment of Jenkerson other than two passing references to referrals she made, reported in documents generated by the rehabilitation facility to which she referred him.  As Jenkerson correctly points out, the fact that the record includes no treatment notes from Dr. Meesarapu does not require (or even allow) the ALJ to reject her opinion, see Soto-Cedeño v. Astrue, 380 Fed. App'x 1, 2 (1st Cir. 2010). But, at the same time, the lack of any evidence concerning Jenkerson's treatment from Dr. Meesarapu certainly diminishes the weight of her opinion.  On remand, full records from Dr. Meesarapu would be helpful.

**Physical Therapist's RFC Assessment.**  Finally, the ALJ discounted Kershaw's functional-capacity assessment on grounds that her "functional capacity testing . . . provides only a 'snapshot' of his functioning and is inconsistent with his minimal medical treatment."  Tr. 13.  In so arguing, Jenkerson erroneously contends that the ALJ was obligated to treat Kershaw as an "acceptable medical source."  He was not so obligated. See SSR 06-03p, at *1-2.

**Conclusion**

For the reasons given, I recommend that: (1) the Commissioner's motion for an order affirming his decision, doc. no. 11, be denied; and (2) Jenkerson's motion for an order reversing the Commissioner's decision, doc. no. 8, be granted to the extent that the case is remanded to the ALJ for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Any objections to this report and recommendation must be filed within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauth. Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 972 F.2d 4, 6 (1st Cir. 1986).

 

 

 

_____
Landya B. McCafferty
United States Magistrate Judge

Date:  March 7, 2011

cc:  Jeffry A. Schapira, Esq.
     Gretchen Leah Witt, Esq.